Peck, J.,
delivered the opinion of the court:
William Donnelly and Patrick Egan claim the proceeds of 348 bales *281 of cotton, which they aver were seized at Wilmington, North Carolina, and sold in New York, under authority of the United States, for a sum not less than $90,000, which sum is in the public treasury.
The cotton was seized at Wilmington in the month of March, 1865. These parties rest their claim for the proceeds upon the 3d section of the act of March 12, 1863.
Before a recovery can be had under the section referred to, among other facts which must neoessárily be proved to the satisfaction of this court, this stands prominent, that a claimant has never given any aid or comfort to the recent rebellion. In the case of Margaret Bond, (2 C. Cls. B,., p. 529,) which is the leading and ruling case, best considered by the court as determining what would be required of parties in similar cases, it is said: “ To entitle a claimant to recover, the act requires that he should prove, by those who had the opportunity of observing his conduct, that he did not give assistance or encouragement to the insurrection. He must go further. His evidence to that effect must cover the entire period, of the war, so that it shall appear that he never gave any aid or comfort to the rebellion.” This requirement is that of the statute, and we see no reason for modifying the ruling so well stated. Without such proof we cannot restore the proceeds of captured and abandoned property. Congress had the right to declare the terms and conditions upon which this should be done, and, having exercised the right, all who seek the benefits of the law must conform to its demands.
Except the testimony of claimants, which is given in a loose and general manner, there is no satisfactory proof that they did not at some time within the progress of the rebellion give to it aid or comfort. The unsupported assertions of claimants to this essential fact does not prevail on the court. We require disinterested testimony stating facts from which conclusions may be drawn. Interest might persuade a claimant that his intentions were good, and if he is permitted to interpret his own actions he might consider himself innocent, when we would think otherwise.
There is no hardship in requiring of claimants, in respect to so marked an event as the rebellion, that they should show by others than themselves that they were at least blameless as to supporting and encouraging it. The testimony of claimants is not convincing, and leaves too much to doubt and conjecture.
Egan says of Donnelly that he has known him since 1859, and that they entered into copartnership in January, 1863; that he knew that both were in all respects loyal to the United States government *282 during the late rebellion, and that neither of them 'gave aid or comfort to it. He (loes not state how he knows these facts about Donnelly, except froth frequent conversations with him. Ho could not speak otherwise than from hearsay as to the c mduct of Donnelly until after January 1863. They did not reside in the same place, and it does not appear that'they were often together. If we recur to the testimony of Donnelly, we have reason to believe that they were separated most of the time from 1859 to 1863. Donnelly says he was “in Wilmington off and on ” during the rebellion, but did not go there to reside or engage in business until 1863. He had resided previously “ in Savannah, Charleston, Augusta, Petersburg, &e.” That Egan resided nearly, if not all the time, in Wilmington; but'in the same breath he says he thinks Egan first went to Wilmington to reside in 1863, and that he met him casually only. Donnelly says of himself that he was constantly moving about engaged in speculation. That when the rebellion broke out in 1861 he was engaged in general speculation, residing in Savannah, which was his regular place of business.
In another part of his deposition Donnelly says, “ After the rebellion broke out I followed the army (confederate) doing a general trading business.” These inconsistent statements show that he could not well have known what Egan was saying and doing prior to 1863 about the rebellion. Neither of these parties declare expressly that they were together for any length of time until after their partnership commenced. How then can either testify correctly as to the other from personal knowledge previous to that time ? Nor does any other witness speak of his own knowledge of the conduct of Donnelly and Egan anterior to this time. What little is said of the loyalty of claimants has reference to a subsequent period.
We do not require affirmative proof as to each day and hour of the life of a claimant during the rebellion, but he must show what his conduct was in reference to months and years. This record is deficient in proof, and does not satisfy us that the claimants are within the conditions required by the statute.
One witness, Edward I. Egan, states that he has known both claimants since 1861; how long since he does not state. He says, also, that he was very intimate with the claimants during the rebellion. This witness of course does not mean during the entire rebellion, as his acquaintance with claimants commenced since 1861. The battle of Bull Run was fought in July, 1861, and the rebellion was flagrant and had been extensively aided and encouraged months before then. It is to be hoped that the words since and during in these dep- *283 osifcions were not used because they admit of a double interpretation, and with a design to convey a wrong impression.
The intimacy of witness with claimants may have existed as he alleges, but he does not state that he lived near either of them, until subsequent to 1863, after they commenced business in Wilmington. It is therefore difficult to understand how this witness can say that neither of these claimants gave aid or comfort to the rebellion “ during its continuance.” Other witnesses give favorable testimony as to the loyalty of claimants after 1863; they only give their impressions and conclusions, but do not state facts. Not one of the witnesses who resided at Wilmington has a word to say in support of his own loyalty, and the presumption is that they could not commend themselves in this respect or they would have done so. They seem willing to express their opinions in a qualified way that claimants were loyal; but omit to show that they have experience or qualifications to enable them to pronounce authoritatively upon the question.
The counsel for claimants seems to rely with confidence upon the assumed fact, that because the names of these claimants were upon a list of individuals who were obnoxious to some rebel general, that they were therefore loyal. The list upon which he relies is not in proof. A witness states that he had seen the list and that he had the original in his hands, and that he handed it over to General Hawley. If the claimants placed any reliance upon the evidence furnished by such a list, they should have produced it, or shown some good reason why it is not in the record.
Claimants, as they say, were transacting a large business at Wilmington from 1863 to 1865, and it is matter of surprise to us that no word is in this record in reference to the blockade. It might be supposed that the attention of the representatives of the defendants would have been directed to some inquiry into the conduct of claimants connected with that subject; but it appears to have been neglected. It may be that the claimants are innocent of any infraction of the laws regulating commerce; if so, we should like to know it by satisfactory proof.
If these claimants are unsuccessful in their efforts to recover the eighty-nine thousand dollars demanded by them, it is not because of any diligence on the part of those representing the United States.
We think this petition should be dismissed, and it is so ordered.